**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MAKEBAH CHILDRESS,**<br>10719 Alpharetta Highway, Unit 442<br>Roswell, GA 30076<br><br>Plaintiff,<br><br>v.<br><br>**PETE HEGSETH, SECRETARY, DEPARTMENT OF WAR,**<br>1000 Defense Pentagon<br>Washington, D.C. 20301-1000<br><br>*Serve*:<br><br>U.S. Attorney General Todd Blanche<br>950 Pennsylvania Avenue, NW<br>Washington, D.C. 20530<br><br>Civil Process Clerk<br>U.S. Attorney's Office for DC<br>601 D Street, NW<br>Washington, D.C. 20530<br><br>Defendant. | **Case No. ______**<br><br>**Jury Requested** |

## COMPLAINT

**COMES NOW** Plaintiff, Makebah Childress, hereinafter "Plaintiff" or "Ms. Childress," by and through her undersigned counsel, and sues Pete Hegseth, Secretary, Department of War ("DOW" or "Defendant"), and for cause of action states as follows:

## NATURE OF THE CASE

1. Plaintiff brings this civil action against the above-named party pursuant to the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. § 701, *et. seq*., as amended, and any statutes

incorporated by reference therein, for relief from disability discrimination and hostile work environment harassment, and/or reprisal. She also brings this civil action based on Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e-3, *et seq*., for reprisal.

**JURISDICTION AND VENUE**

2. This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331, as Plaintiff asserts a claim that arises under the laws of the United States, and specifically, Title VII and the Rehab Act, and/or jurisdiction under each of those respective statutes.

3. Venue is appropriate under 28 U.S.C. § 1391 and is based on the fact that the actions complained of herein were made by the Defendant, a federal, executive Agency that exists within the District of Columbia, and its employees.

4. Plaintiff worked remotely from the District of Columbia, and, on information and belief, many of the relevant management officials and witnesses work in, and/or documents, exist in, this judicial district.

5. The Defense Intelligence Agency ("DIA" or "Agency"), on information and belief, is headquartered in this judicial district and an address for DIA was listed as the location of the relevant agency and unit during the investigation of Plaintiff's EEO Complaint.

6. The District of Columbia, then, serves as the best overall district to adjudicate this matter.

**PARTIES**

7. Plaintiff is a biological woman, who has physical disabilities, which are visible. At all relevant times, she was an employee of DIA.

8. The Defendant is the Secretary of the DOW, a large federal agency which oversees numerous components and smaller federal agencies, such as DIA, which provide

resources and intelligence to support the United States ("U.S.") Military in defending the U.S. against threats from this country and abroad.

**EXHAUSTION OF REMEDIES**

9. On or about February 5, 2020, Plaintiff initiated contact with an Equal Employment Opportunity ("EEO") counselor for DIA Complaint No. 2020-00038.

10. On or about March 19, 2020, Plaintiff filed a Formal EEO Complaint regarding DIA Complaint No. 2020-00038.

11. On or about April 21, 2020, Plaintiff filed an amendment to her complaint.

12. On or about December 17, 2020, Plaintiff filed a second amendment to her complaint.

13. On or about June 23, 2021, DIA's EEO office issued the Report of Investigation ("ROI) for Plaintiff's complaint and transmitted it to Plaintiff.

14. On or about July 20, 2021, Ms. Childress filed a request for a hearing through the Equal Employment Opportunity Commission ("EEOC"), EEOC No. 570-2021-01238X.

15. Around one (1) year later, on or about June 14, 2022, an Initial Status Conference was held regarding EEOC No. 570-2021-01238X.

16. On or about June 21, 2022, Plaintiff filed a Motion to Clarify the Claims at Issue and Motion to Amend Complaint, which were later granted in part.

17. On or about January 4, 2023, after discovery concluded, DIA filed its Motion for Summary Judgment.

18. On or about January 19, 2023, Plaintiff filed her Opposition to DIA's Motion for Summary Judgment.

19. On or about December 6, 2023, the EEOC issued a Notice of Reassignment and Status Conference assigning Plaintiff's case to a new administrative judge.

20. On or about May 2, 2024, the new administrative judge issued a Decision and Order, granting the Agency's Motion for Summary Judgment.

21. On or about June 10, 2024, the Agency issued the Final Agency Decision ("FAD"), affirming the administrative judge's Decision and Order.

22. On or about July 10, 2024, Plaintiff submitted an appeal of that FAD and Decision and Order to the EEOC's Office of Federal Operations ("OFO").

23. On or about February 25, 2026, OFO issued a decision upholding the administrative judge and DIA's decisions.

24. On or about March 22, 2026, Plaintiff filed a request for reconsideration to OFO requesting that OFO reconsider its February 25, 2026, decision.

25. On or about June 22, 2026, OFO issued a decision denying Plaintiff's request for reconsideration.

## RELEVANT FACTS

### Background, Qualifications, & Experience

26. Between 2008 and 2021, Plaintiff was a Security Specialist within DIA's Office of Security.

27. Her duties included adjudication and ensuring due process for personnel clearances for Top Secret ("TS") eligibility and resolving difficult personnel security concerns.

28. They also included security management of DIA's special access programs, developing, advising, and/or implementing Sensitive Compartmented Information ("SCI")

policies for DIA and the then, Department of Defense ("DOD"), and providing SCI certification training to the Special Security Officer ("SSO") employees within DOD.

29. During most of the relevant period of her tenure with DIA for her instant EEO Complaint, i.e., from November 2018, through October 2021, Plaintiff was at a GG-13 level (*i.e.*, GS-13).

30. Plaintiff's first line supervisor during at least part of that time was Weston Dunn, Supervisory Security Specialist, and her second line supervisor was Anne Lowe, Deputy Branch Chief.

31. Ms. Lowe had been Plaintiff's supervisor in some way or capacity since Ms. Lowe joined DIA in 2012.

32. The Branch Chief during at least part of the relevant period of instant EEO Complaint was Maurice Blount.

33. Plaintiff suffers from a disability, scoliosis, and had an approved reasonable accommodation for a sit-to-stand desk and remote telework since 2014.

34. In August of 2017, Plaintiff transferred official work locations from the Washington, DC metro area to Fort Gillem, Georgia, as she moved to Georgia, but many of her colleagues and managers still resided in the Washington, DC metro area.

35. From the time she transferred to Georgia through the first few months of fiscal year 2021, before she went on leave for an extended period of time, Plaintiff had fully satisfactory (*i.e.*, successful) or better ratings on her performance objectives related to her end of year performance appraisals.

36. Her performance was well-regarded to the point where she was usually assigned the more difficult security clearance cases to adjudicate.

**Prior EEO Complaints and Knowledge of Plaintiff's Protected Classes**

37. Plaintiff filed two prior EEO complaints bearing Agency Numbers DIA-2013-0021 and DIA-2015-0028, before the instant Complaint at issue.

38. The prior EEO complaint from 2013 was filed in part because Plaintiff had been requesting a sit-to-stand workstation as a reasonable accommodation for approximately two years.

39. That complaint ultimately resulted in a compliance survey across the entire office and management officials being removed, reassigned, and/or encouraged to resign.

40. Plaintiff ultimately received the sit-to-stand workstation, which she used until she was sent home in March 2020 due to the Covid-19 pandemic.

41. One of the responsible management officials for that complaint was Ms. Lowe.

42. Plaintiff's second EEO complaint, which was initiated in 2015, was against solely Ms. Lowe, and was resolved before arriving at the formal stage.

43. Some time after Plaintiff filed her complaints, the former Division Chief, Karen McCord, informed employees that Plaintiff was responsible for filing the complaint.

44. Ms. Lowe was also a responsible management official in that complaint.

45. Plaintiff also informed Mr. Blount that she had previously filed two (2) Complaints.

46. Since then, Mr. Blount has indicated, for example, that he felt that Plaintiff filed complaints when she was in a situation she did not like or when she did not get her way.

47. Mr. Blount also made comments aloud in the office in front of Plaintiff's peers about needing to be careful or Plaintiff would file an EEO complaint.

48. Mr. Dunn was also aware that Plaintiff had a disability and her standing desk.

49. Mr. Blount was aware, during the relevant period, of Plaintiff having a disability based on her requesting reasonable accommodations and, in particular, the standup desk.

50. Ms. Lowe was aware that Plaintiff claims a disability and an accommodation.

51. Ms. Lowe was aware of Plaintiff's prior EEO complaints because she was named as a responsible management official in both complaints.

52. Plaintiff was the only employee in her section that identified as having a disability.

53. Plaintiff was the only employee in her section that had a reasonable accommodation, at least pre-March 2020 due to the Covid-19 pandemic.

54. Plaintiff was the only employee in her section that had filed prior EEO complaints against their supervisors at issue during the relevant period.

**Issues Related to Instant Complaint**

55. Plaintiff began being remotely supervised by Mr. Dunn toward the end of 2018.

56. Mr. Dunn worked out of the Fort Meade, MD office.

57. Shortly after Plaintiff reporting to Mr. Dunn, she informed him, like she had previously informed Ms. Lowe and Mr. Blount, that she needed to take more leave than usual based on her disabilities, including annual leave and leave without pay, and that the need for leave could sometimes come on short notice.

58. For his part, Mr. Dunn informed her that he was told by their higher supervisors to keep an eye on Plaintiff, without elaborating further.

59. Starting in November 2018, Mr. Dunn began excluding Plaintiff from

department-wide meetings that related to changes in how Plaintiff and her colleagues would be performing their duties, like those that she had previously been notified of and attended before reporting to Mr. Dunn.

60. These meetings were necessary for understanding changes to how you were supposed to conduct your duties, as these new changes were not based on training or previously existing policies.

61. Plaintiff's similarly situated colleagues were notified about these meetings before they occurred and thus, were able to attend them.

62. Plaintiff started finding out about meetings from her co-workers a day or so after the meetings occurred.

63. As a result of this, Plaintiff requested her colleagues let her know about the meetings beforehand to give her a chance to attend.

64. This resulted in Plaintiff gaining knowledge of and being able to attend some meetings, but in those situations, Mr. Dunn would express surprise to her that she was attending those meetings.

65. Moreover, she still was not made aware of and/or invited to attend certain meetings that occurred, including some on or about November 27, 2018, January 10, 2019, April 23, 2019, and December 13, 2019.

66. As a result of missing those meetings, Plaintiff missed some relevant information that pertained to her duties, making it harder for her to keep up with the changes made to her duties and causing her to be reprimanded for not performing her duties based on the new changes being discussed during those meetings.

67. One of these meetings included a change to review process for cases involving

adjudication of employee's security clearances, where Mr. Dunn now had to be sent emails where cases were being closed,

68. It also caused her emotional distress based on the information she needed to continue performing her duties not being communicated to her.

69. Plaintiff notified Mr. Dunn about this issue, and he continued not apprising her of meetings, indicating to her that he simply forgot to inform her of these meetings.

70. Plaintiff also notified Ms. Lowe and Mr. Blount about not being invited to these meetings.

71. One or both responded to her that they would have Mr. Dunn back-brief her on the substance of these meetings, ignoring her concerns about not being invited to the meetings in the first place, but he still was either not told to do this and/or still failed to inform Plaintiff of what was discussed and/or decided at these meetings.

72. Around this same time, on or about March 29, 2019, Mr. Dunn unjustifiably denied Plaintiff's request for sick leave, even though she had previously told him she needed to take leave due to her disabilities.

73. This was also the case even though Mr. Dunn had called Plaintiff the day before, on a Sunday, on her personal phone, to let her know the date of her leave request was improperly set for the Sunday, without indicating that he was going to be denying her request.

74. Mr. Dunn did not deny Plaintiff's similarly situated colleagues' leave requests under similar circumstances during the relevant period.

75. As a result of Mr. Dunn's actions with respect to this leave request, Plaintiff became fearful of requesting leave she needed to take for her disabilities, for example.

76. In April 2019, Mr. Dunn began criticizing Plaintiff for not following procedures.

77. This involved Mr. Dunn demeaning Plaintiff for not forwarding him three cases she had recently adjudicated for a second review when she was closing the case, as the policy she had been following had been issued by Ms. Lowe around four (4) or five (5) months prior.

78. Plaintiff found out this new policy or requirement was communicated during one of the prior meetings she was not able to attend on this occasion because Mr. Dunn did not have virtual teleconferencing ("VTC") set up before the meeting, even though he knew Plaintiff would be joining remotely.

79. As a result of this, on or about April 15, 2019, Mr. Dunn placed a restriction on Plaintiff's cases in their case management system that required her to send all of her cases to him for a second review before she could close them, as opposed to her colleagues who were just sending him their cases for a second review after closing them.

80. In doing this, Mr. Dunn prevented Plaintiff from closing her cases, indefinitely.

81. One of the cases for which Mr. Dunn was accusing Plaintiff of not properly following procedures on actually belonged to Donna Mitchell, another Security Specialist with no disability and no prior EEO activity, but Mr. Dunn did not similarly demean Ms. Mitchell or put more stringent requirements on her.

82. As a result of Plaintiff sending Mr. Dunn all of her cases to review before she could close them, he began falling behind on closing out her cases, which resulted in Plaintiff falling behind on her monthly adjudicatory statistics as these cases sat in queue instead of closed, which, in turn, made her look less productive, like she was not adequately performing her duties, and ultimately, negatively affected her end of year performance appraisal.

83. Mr. Dunn reported that the issues Plaintiff was having was an office-wide issue,

but her colleagues with the same GG-level on the same team were not required to send him all of their cases for review before closing them.

84. Plaintiff spoke with Mr. Blount about her concerns in or around May 2019, and informed him that she had initiated the process for a DIA harassment complaint.

85. However, instead of trying to act responsive to her concerns, Mr. Blount, as he did on other occasions when Plaintiff raised concerns to him about Mr. Dunn, would make excuses about Mr. Dunn being a new supervisor, even after he'd been in the role for a while.

86. Ultimately, he agreed that Mr. Dunn's restriction on her cases should be removed because it was indefinite and, on information and belief, went into the system to remove it.

87. He also indicated that he would allow Plaintiff to transfer from under Mr. Dunn at the end of the fiscal year if she withdrew the complaint with which she complied.

88. Some time thereafter, Mr. Dunn went back into the case management system to again place the restriction on Plaintiff's cases.

89. In June 2019, Mr. Dunn and Plaintiff met to discuss her concerns on the case restriction.

90. However, instead of trying to alleviate her concerns, he advised Plaintiff that Ms. Jeanette Courtney was taking away Plaintiff's telework privileges due to her alleged lack of production on her cases. in an attempt to intimidate and harass Plaintiff.

91. On or about July 1, 2019, Mr. Dunn reassigned Plaintiff three cases from her colleague, Bridget Holt, while she was on vacation for one (1) week.

92. These cases did not need to be reassigned while Plaintiff was out as they were in Ms. Holt's queue, would have remained in her queue had they not been reassigned to Plaintiff,

and were not on a time restriction to be adjudicated.

93. Cases part of employees' queues are not supposed to be reassigned when they go on leave, unless it is for an extended period of time.

94. Plaintiff was going to be taking leave the following day for one (1) week, a request Mr. Dunn had previously approved, and thus, she informed Mr. Dunn that she would not be able to handle those cases.

95. Mr. Dunn eventually transferred Ms. Holt's three cases out of Plaintiff's queue to another colleague's queue, but did not allow Plaintiff to reassign any of her cases while she was going out on leave.

96. This transfer of case assignments was not the only time this happened, however, as Mr. Dunn had regularly, since he took over as Plaintiff's supervisor, reassigned her cases from other employees' queues that had not been adjudicated for a long while and then were reassigned to her with an expedited date to complete.

97. Based on information and belief, Plaintiff's colleagues, including Ms. Holt, did not have a disability and/or prior EEO protected activity.

98. Similarly, Plaintiff's colleagues, including Ms. Holt, were given much easier cases to adjudicate overall than Plaintiff.

99. As a result, in or around August 2019, after Plaintiff raised concerns to Mr. Blount, he instructed her to request a few non-issue, or easier, cases from her acting supervisor at the time, Ms. Laura Tornell.

100. However, Ms. Tornell advised Plaintiff that she had been previously instructed by Mr. Dunn not to assign Plaintiff non-issue cases.

101. In September 2019, Mr. Dunn wrote a negative summary on Plaintiff's performance appraisal when he stated that she was required to improve her production for completed cases, even though her production was not objectively below successful.

102. This was because her performance plan did not dictate a specific number of cases that needed to be adjudicated in order for her to be successful in the relevant appeal.

103. It was also because Plaintiff was assigned more complex cases to adjudicate overall as compared to her colleagues, which required more time to complete, as she was told management considered her to be a "senior" adjudicator who presumably could handle these more complex cases.

104. Further, the fact that Mr. Dunn had required her to submit to him her cases for a second review unlike her colleagues, and because he failed to complete his review of those cases in a timely manner, those cases stayed in Plaintiff's queue, hurting her case completion statistics.

105. By approximately October 2019, at the beginning of the new fiscal year, Plaintiff reached out to Mr. Blount to inquire with him again about transferring from under Mr. Dunn's supervision.

106. At that point, Mr. Blount indicated he was not going to permit Plaintiff to transfer away from Mr. Dunn.

107. On November 19, 2019, and January 6, 2020, Mr. Dunn distributed production statistics to Plaintiff and her colleagues, Ms. Holt, Ms. Mitchell, and Ms. King, to harass and embarrass Plaintiff by showing her as minimally successful, because her adjudicated case numbers were lower than her colleagues' adjudicated case numbers.

108. This was done notwithstanding the fact that Plaintiff had significantly more complex cases than her colleagues, for example, which led to her being able to adjudicate less

cases.

109. In addition, after Plaintiff performed her own analysis of her cases completed, she found that Mr. Dunn failed to include in his calculation some of her cases, making her scores even lower than they should have been, and also indicating that she would have been deemed successful had those cases been counted.

110. Plaintiff reached out to Mr. Dunn on or about January 13, 2020, to inform him of her calculations and address the discrepancies.

111. After hearing what she said, he confirmed that he failed to take into account two of her cases in his totaling of the numbers.

112. On or about December 2, 2019, Plaintiff sent Mr. Blount a message to make him aware that she had requested leave for a surgical consultation.

113. She did this because she noticed whenever she sent Mr. Dunn a leave request, he would sit on it for a while to make Plaintiff stressed because she was not sure she would be able to take leave for a given medical appointment.

114. Given Mr. Dunn's harassing conduct of not responding to Plaintiff's leave requests in a timely manner, Plaintiff had received approval from Mr. Blount and/or Ms. Lowe to reach out to them on her leave requests, and followed that guidance on this day.

115. Sometime after Plaintiff sent the message to Mr. Blount, Mr. Blount informed Mr. Dunn that she was going to be taking leave.

116. However, on that same day, Mr. Dunn still messaged Plaintiff about her whereabouts that day to harass her.

117. On or about December 6, 2019, Mr. Dunn only partially approved Plaintiff's

timesheet.

118. Upon Plaintiff reaching out about why, Mr. Dunn failed to respond, and never provided her with any justification for only approving part of her timesheet.

119. Mr. Dunn did not only partially approve any other of Plaintiff's similarly situated colleagues' timesheets and/or deny providing them an explanation.

120. On or around December 30, 2019, Mr. Dunn assigned Plaintiff approximately fifteen (15) cases to adjudicate while she was on approved leave for two weeks.

121. He did not similarly assign Plaintiff's similarly situated colleagues any cases while they were on leave during this time.

122. The ordinary custom and/or practice for Plaintiff's unit was for her and her colleagues to not be assigned cases while they are on leave, but this was not followed with respect to Plaintiff.

123. On or about December 31, 2019, Ms. Lowe assigned Plaintiff another case while she was out on leave.

124. As a result of Plaintiff being assigned all of these cases while she was on leave, upon her return to work on or about January 6, 2020, Plaintiff had to provide and/or update timelines for the cases that she had in her queue.

125. With the addition of these new cases, and her not being able to act on them for approximately seven (7) days, she had to try to explain in her timelines why delays existed in adjudicating those cases.

126. These timelines are reviewed by an employee's supervisors to ensure adjudicators are being as timely as possible on their investigations.

127. Upon her return to work, in addition to catching up on all of her prior cases in her queue from before she went out on leave, she now had to work on all of the new cases assigned to her from Mr. Dunn and Ms. Lowe, all leading to a stressful return to work.

128. While she was trying to catch up on all of the work she had within a few days of her return to work, Mr. Dunn questioned her in a demeaning tone and fashion about the length of adjudicating some of her cases and told her in regard to one case, that "you had plenty of time to do this case."

129. Mr. Dunn did not similarly question Plaintiff's colleagues about their delays on cases, or make harassing remarks to them about how much time they had to adjudicate cases.

130. Similarly, on or about January 8, 2020, Mr. Blount rushed Plaintiff to finish adjudicating the case Ms. Lowe had assigned to her while she was on leave that she was not informed needed to be expedited.

131. As a result, Plaintiff tried to make a recommendation on whether to grant the applicant's request for a security clearance, but she did not have enough information to make a proper recommendation.

132. Given the rush she was under, she put out the best recommendation she could under the circumstances, sent her recommendation to her managers, and stopped working briefly to attend a pre-scheduled and approved medical appointment for her son.

133. Her managers did not agree with her recommendation and so they added additional information before sending the case back to Plaintiff.

134. Upon her return to work later that same day, Plaintiff closed the case.

135. On or about January 9, 2020, Mr. Dunn informed Plaintiff that he was removing her fitness program privileges.

136. He also informed her that he was requiring her to change to a restrictive schedule that limited her ability to attend medical appointments during the work week because she was now being required to work only during core duty hours, and resulted in her having to taking more leave because she could no longer make up the work after her appointments concluded.

137. Lastly, he directed her to send him check in/out communications daily when she began work and ended work.

138. His alleged justification for making all of these changes was his baseless allegation that she had erratic attendance and poor case production statistics.

139. Mr. Dunn did not remove fitness program privileges, require a restrictive schedule, and/or require to check in/out with him for any of Plaintiff's similarly situated colleagues, such as Ms. Holt, Ms. Mitchell, or Ms. King.

140. On or about January 13, 2020, Mr. Dunn held a meeting with Plaintiff.

141. During that meeting, he attempted to intimidate her into sharing her health conditions, and when Plaintiff informed him of her concerns about doing so, he responded by stating, "just tell me what it is."

142. On January 16, 2020, Plaintiff was on leave as she was in court for jury duty when she took a screenshot of the court-issued summons and had a coworker email it to her supervisors.

143. Taking a screenshot of documentation was something that could be submitted to support a leave request based on DIA custom and/or practice, and was not something that violated any DIA policies at the time.

144. Plaintiff served on the jury for the remainder of the workweek and into the following week, until she returned to work on or about January 21, 2020.

145. Upon her return to work, she submitted additional paperwork to establish she was on jury duty.

146. However, over the next two (2) weeks, Mr. Dunn requested more and more information about her jury duty, most of which was irrelevant and/or not necessary via DIA policy, including whether she had been paid for her jury service, in order to continue harassing her.

147. Around this same time, on multiple occasions, including on or about January 22, 2020, January 23, 2020, and February 4, 2020, Mr. Dunn, as well as Ms. Lowe and Mr. Blount, failed to approve Plaintiff's requested Family and Medical Leave Act (FMLA) leave in a timely manner.

148. These requests, which were sent on initially by Plaintiff and often followed up by DIA's human resources and/or labor relations representative, were often ignored until the day or so after the leave was requested.

149. As a result, on January 22, 2020, after not hearing anything on her leave request, Plaintiff had to drive two (2) hours to physically come into the DIA office to avoid being placed on AWOL.

150. On another occasion, Plaintiff was forced to miss her medical appointment because Mr. Dunn did not approve her FMLA request in time for her appointment.

151. On or about January 27, 2020, Mr. Dunn scheduled a meeting with Plaintiff for a day she was out on leave under FMLA.

152. On or about February 5, 2020, Plaintiff initiated EEO contact for her instant Complaint.

153. On February 7, 2020, Mr. Dunn instructed Plaintiff to perform additional work

on a complex case beyond the Executive Summary she and her colleagues complete for all of their cases, which was a new task and for which she received no guidance.

154. The additional work required was to submit a readdown instead of just the summary, and was going to take a lot of time to complete.

155. Soon thereafter, Ms. Tornell, who was filling in again as Plaintiff's supervisor, instructed her not to complete that work after she asked her about it.

156. Upon Mr. Dunn's return to the office, he reversed Ms. Tornell's instruction and once again, required Plaintiff to complete that work.

157. Mr. Dunn did not have Plaintiff's colleagues, such as Ms. Holt, complete similar additional work on their complex cases.

158. On or about February 21, 2020, Mr. Dunn requested that Plaintiff approve performance objectives for the performance review period that were not related to her job.

159. Mr. Dunn informed her that the objectives related to training she was eventually going to receive, and that if she was not trained, she would not be rated on the corresponding performance element.

160. However, she was never assigned to and/or allowed to receive the training.

161. Yet, Plaintiff ended up receiving an unjustifiably low score on that element regardless.

162. The rest of her colleagues either received the training and were able to meet the objectives for their performance appraisal, or were not provided the training but also were not given a low rating on the element at issue.

163. On or about March 4, 2020, Mr. Dunn instructed Plaintiff to make a certain case

a priority, so she completed the case that day and submitted her recommendation to him, as well as Mr. Blount and Ms. Lowe.

164. In response, Mr. Blount questioned as to why Plaintiff had the case because the case should have never been assigned to her in that the information was incomplete, indicating that Mr. Dunn set her up to be embarrassed in order to further harass her.

165. The time Plaintiff spent working on this case that should never have been assigned to her in the first place detracted from the time she could have spent on other cases and her overall production metrics, which she had already been told she was having difficulty meeting, allegedly.

166. On or about March 9, 2020, Plaintiff worked on a particularly complex case of a similar nature to one she had dealt with previously, and thus, made reference to the other case in her recommendation, so she could better explain her recommendation to Mr. Dunn and management.

167. In response, Mr. Dunn scolded Plaintiff verbally and in writing for doing this, claiming this was not appropriate due to the possibility of the applicant finding out about it and, thus, violating the privacy of the previous applicant.

168. Yet, the case management system containing the recommendation is classified, meaning there is no possibility it can be viewed by the applicant.

169. In addition, no policy in place at that time prohibited the referencing of a former case within a write up for another case.

170. She and her colleagues had done this in similar circumstances over the years, acknowledging similar cases that may have set precedent, and her colleagues had not been reprimanded.

171. On or about March 19, 2020, Plaintiff submitted the instant EEO Complaint.

**Reasonable Accommodation Issues**

172. Plaintiff worked from a standing workstation at her in-person office in Georgia until March of 2020, when DIA directed all high-risk employees to work from home due to the COVID-19 shutdown.

173. All "High Risk for COVID-19" employees, such as Plaintiff, were then on Administrative Leave between March 18, 2020, toward the end of June 2020, when they received laptops at their homes.

174. Around this time, Plaintiff asked management about obtaining the standing workstation for teleworking at her home that she had utilized while working in person at the office based on her disabilities as part of a reasonable accommodation.

175. Mr. Blount, upon Plaintiff's second request, responded by asking her something to the effect of, "Do you want to work, or not?"

176. Plaintiff then worked without her standing desk at home over the next few weeks.

177. After a few weeks, Plaintiff inquired with Mr. Blount again between July and August 2020 asking if she could request the standing workstation currently at the Fort Gillem/ JRIC location, but he told her that there was no need because they were getting staff back to the office to work in person.

178. By the time that communication happened, Plaintiff was too afraid to bring up the topic of the sit-to-stand desk again as she feared for her job and having to return to work in person given her high risk of having complications from COVID-19.

179. As a result, she teleworked, but had to sit throughout her workday to perform her

duties.

180. On October 29, 2020, Mr. Blount and Ms. Lowe distributed a schedule to the entire office that showed Plaintiff was the sole adjudicator required to return to the office full time.

181. But Plaintiff was considered high risk for purposes of the COVID-19 pandemic, something she had certified on several occasions earlier that year.

182. Based on that, for example, her situation fit into categories of employees that DIA allowed to remain working from home.

183. On November 5, 2020, Mr. Dunn, Ms. Lowe, and Mr. Blount instructed Plaintiff to request information from her case subjects using her unclassified email address, thus disclosing her full name to the case subject.

184. Plaintiff had voiced concerns about this previously, because she has a unique name and felt like applicants would now have access to her information raising safety concerns, as opposed to her colleagues with less unique names.

185. If any of Plaintiff's colleagues who had no prior EEO activity, for example, had shared a concern about this, their supervisors would have respected their concerns and tried to work with them on a solution.

186. Prior supervisors did not require Plaintiff and her colleagues' names to be shared and discouraged them from doing so for safety reasons.

187. During in or around October and November 2020, Plaintiff had two cases in her queue that Mr. Dunn had been sitting on and had not signed off on her recommendation for, as he indicated on several occasions that she needed to add additional information that she did not find to be appropriate and/or accurate.

188. Around this same time, Plaintiff noticed that there was a pattern where Mr. Dunn would conduct himself similarly and, hence, prolong cases involving an individual with a Muslim background.

189. Plaintiff informed her new, would-be supervisor, Donesha Powell, of the issues surrounding the cases at issue, which she sent up the chain of command, and which was subsequently sent up higher through the command.

190. Instead of trying to understand her concerns, Mr. Blount, in communications involving the Division Chief, belittled her to make her seem to other superiors that she was not properly doing her job or following her supervisor's direction.

191. However, Plaintiff's concerns stemmed from what she interpreted to be her supervisor committing a policy violation, and if she were to add that information, she would be committing the same policy violation she was concerned about Mr. Dunn violating.

192. As such, this was another attempt by her managers to try to make her look like she was not satisfactorily performing her duties, to intimidate her, and make her out to be someone who likes to complain a lot, given her prior EEO activity, which was another instance of harassment contributing to Plaintiff experiencing severe emotional distress due to her work environment.

193. In or around November 2020, Plaintiff's request to transfer supervisors due to the discrimination and harassment she was experiencing by Mr. Dunn, in particular, was finally approved and/or effectuated, and she was placed under Ms. Powell.

194. Once this occurred, the discrimination and/or harassment of Plaintiff on a regular basis began to cease, with the exception of her still not being accommodated.

195. In February 2021, Plaintiff suffered a work-related injury because of the denied

accommodation that left her sitting continuously in order to perform her duties.

196. Specifically, she was diagnosed with Deep Vein Thrombosis/blood clots across ten veins and one superficial vein in her left leg after receiving treatment in the Emergency Room.

197. Several weeks later, she was admitted to the hospital again for four (4) days due to menorrhagia and had to undergo a blood transfusion.

198. Per her doctor's orders after that occurred, she was restricted from working for six months and placed on bedrest.

199. After the conclusion of her bedrest and as a result thereof, Plaintiff developed plantar fasciitis and had to attend numerous medical appointments for treatment.

200. Shortly thereafter, she suffered a pinched nerve and was diagnosed with meralgia paresthetica and neuritis.

201. Thus, she was not finally cleared to return to work, with restrictions, until October 2021.

202. That month, Plaintiff submitted a request to work within her medical restrictions, which included working from home, a modified work schedule, and permission to retrieve her standing workstation from the office or receive a new one that would be delivered to her home.

203. Plaintiff was not made aware until February 2022 that her reasonable accommodation request was denied.

204. On or about October 8, 2021, Ms. Powell and Ms. Lowe issued Plaintiff a partially negative performance appraisal for Fiscal Year (FY) 2021.

205. In sections 11(A) and 11(E) of the pertinent appraisal, for example, Plaintiff received a minimally successful rating.

206. However, these ratings came with no explanation to help Plaintiff understand how she did not successfully complete those elements, especially given Ms. Powell had indicated to her prior to her injury that she was performing well.

207. They also came after she received updated performance objectives that began from approximately December 3, 2020, through the date of her injury on February 26, 2021, which was less than the 90-day minimum rating needed to be able to evaluate performance per DIA policy.

208. Plaintiff was also given no prior notice of a potential of low ratings in these elements, and had no quarterly check-ins with her supervisor were conducted as required by policy before giving her those ratings.

## COUNT ONE

**Disability Discrimination**
29 U.S.C. § 791, *et. seq.*; 42 U.S.C. § 12203, *et. seq*.
(*Disparate treatment*; *Denial of Reasonable Accommodation*)

209. Plaintiff incorporates all information and allegations contained in the preceding paragraphs, as if fully set forth herein.

210. As a governmental entity that receives federal financial assistance and/or employs federal employees, Defendant must comply with the Rehabilitation Act, any acts incorporated by reference therein.

211. Plaintiff is a disabled individual and a member of a protected class who worked for the Defendant and is entitled to equal rights under the law pursuant to 29 U.S.C. § 791, *et. seq*.

212. Plaintiff is a qualified individual with disabilities and is entitled to equal rights under the Rehabilitation Act.

213. Defendant, by and through its agents, discriminated against Plaintiff by, *inter alia*, failing to accommodate her disabilities, giving her negative performance feedback on her performance appraisals, failing to approve her leave requests in a timely manner, scheduling meeting(s) for days she was on leave, sharing intimate details about her disabilities with at least one employee who did not have a need to know, presented inaccurate statistics on her case adjudication numbers, requiring her to perform additional duties beyond what was required, and prioritizing certain cases that hurt her case adjudication merits.

214. Plaintiff was the only employee in her unit and/or department who faced this conduct. Similarly situated employees, such as Ms. Holt and Ms. Mitchell, who did not have any known disabilities, were not subjected to the same conduct.

215. Defendant, by and through its agents, also discriminated against Plaintiff by failing to engage fully in the interactive process with Plaintiff after she requested renewed accommodations for her disability to provide her with a sit-to-stand desk while teleworking from home, and later, to provide that desk, a modified work schedule, and teleworking full-time.

216. Plaintiff suffered severe injuries and emotional distress as a result of the Defendant's failure to accommodate her and/or for disparately treating her based on her disabilities.

217. The Defendant's agents were on notice of Plaintiff having a disability and requesting reasonable accommodations.

218. Plaintiff's disabilities and reasonable accommodation requests led to Defendant's unlawful conduct toward Plaintiff.

219. Defendant's unlawful conduct created a climate of fear and intimidation for Plaintiff.

220. The reasons proffered by Defendant for its unlawful conduct are pretextual and the Defendant cannot further offer any legitimate reason for its unlawful conduct.

221. Defendant's unlawful conduct negatively impacted the terms, conditions, and privileges of Plaintiff's employment.

222. Defendant and/or its agents were acting within the course of and scope of their employment during these incidents, as all of the conduct occurred within it purview while all involved employees were on duty.

223. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of her disabilities and reasonable accommodation requests.

224. The foregoing actions by Defendant constitute discrimination on the basis of Plaintiff's disabilities, which have infringed upon Plaintiff's terms and conditions of employment, as well as her right to the full and equal protection of the law.

225. As a result of Defendant's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including, but not limited to, lost earnings and other financial losses, embarrassment, humiliation and other forms of pain and suffering that is on-going, and permanent in nature without Plaintiff in anyway contributing thereto.

226. Defendant is responsible for the acts and omissions of its supervisory employees for actions taken in the scope of and in the course of their employment under the theory of *respondeat superior*.

## COUNT TWO

**Reprisal Based Upon Prior EEO Activity**
29 U.S.C. § 791, *et. seq.*; 42 U.S.C. § 12203, *et. seq.*; 42 U.S.C. § 2000e-3, *et seq.*
(*Reprisal Discrimination*)

227. Plaintiff incorporates all information and allegations contained in the preceding paragraphs, as if fully set forth herein.

228. The Rehabilitation Act, by incorporating by reference to the Americans with Disabilities Act's reprisal prohibition, prohibits reprisal for requesting an accommodation based on one's disability and/or filing a complaint of disability discrimination.

229. Title VII prohibits reprisal for engaging in prior EEO activities.

230. As a governmental entity that receives federal financial assistance and/or employs federal employees, Defendant must comply with the Rehabilitation Act and Title VII.

231. Plaintiff's protected EEO activities for reprisal include EEO complaints she initiated back in 2013, and 2015, based on her disability prior to the instant complaint at issue, the current complaint at issue, and her requests for reasonable accommodation.

232. Plaintiff was subjected to retaliation from the Defendant through itself and/or its agents based on Plaintiff's protected status, for its direct conduct against Plaintiff and/or through *respondeat superior*.

233. Defendant's agents retaliated against Plaintiff as a result of her oppositional and/or protected activity by, *inter alia*, adding 16 or so cases to her queue while she was on leave, requiring her to expedite cases with no warning, removing her civilian fitness program privileges, requiring her to change to a more restrictive daily schedule to prevent her from attending medical appointments, requiring her to check in and check out every day, failing to accommodate her disabilities, giving her negative performance feedback on her performance appraisals, failing to

approve her leave requests in a timely manner, scheduling meeting(s) for days she was on leave, sharing intimate details about her disabilities with at least one employee who did not have a need to know, presenting inaccurate statistics on her case adjudication numbers, requiring her to perform additional duties beyond what was required, and prioritizing certain cases that hurt her case adjudication merits.

234. Plaintiff was the only employee in her unit and/or department who faced this conduct.

235. Similarly situated employees, such as Ms. Holt, Ms. Mitchell, and/or Ms. King, who did not have prior EEO activities for the relevant period, were not subjected to the same conduct.

236. Defendant's agents made several comments to Plaintiff and/or her colleagues expressing that Plaintiff had filed an EEO complaint and/or were showing their displeasure to her for filing said complaints.

237. Defendant and/or its agents were acting within the course of and scope of their employment during these incidents, as all of the conduct occurred within his purview while all involved employees were on duty.

238. The unwelcome retaliatory incidents made by Defendant and/or its agents toward Plaintiff constitute reprisal in violation of the Rehabilitation Act and/or in violation of Plaintiff's right to equal protection under the Fourteenth Amendment to the U.S. Constitution.

239. The reasons proffered by Defendant for its unlawful conduct are pretextual and the Defendant cannot further offer any legitimate reason for its unlawful conduct.

240. Defendant had notice and knowledge of unlawful conduct by its agents and, through its failure to remedy and prevent such violations of law and by perpetrating such

violations of law, established retaliation as the custom and policy of the Defendants.

241. Defendant had notice and knowledge of unlawful conduct by its agents and, through its failure to remedy and prevent such violations of law, demonstrated deliberate indifference to the risk that such activity would result in constitutional violations against Plaintiff.

242. Defendant's retaliatory conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her protected activities.

243. Plaintiff did not solicit or incite the retaliatory conduct she experienced.

244. As a result of Defendant's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including, but not limited to, lost earnings and other financial losses, embarrassment, humiliation and other forms of pain and suffering that is on-going, and permanent in nature without Plaintiff in anyway contributing thereto.

245. Plaintiff has incurred lost wages and/or loss of career opportunity, now and into the future, without Plaintiff contributing any negligence thereto.

## COUNT THREE

**Disability Harassment**
29 U.S.C. § 791, *et. seq.*; 42 U.S.C. § 12112, *et. seq*.
(*Hostile Work Environment*)

246. Plaintiff incorporates all information and allegations contained in the preceding paragraphs, as if fully set forth herein.

247. The Plaintiff is a qualified individual with disabilities and is entitled to equal rights under the Rehabilitation Act.

248. As a governmental entity that receives federal financial assistance and/or employs federal employees, Defendant must comply with the Rehabilitation Act.

249. Defendant and/or its agents are responsible for the acts and omissions of its employees for actions taken in the course of and scope of their employment under the theory of *respondeat superior*.

250. Defendant was on notice of Plaintiff's disabilities and reasonable accommodation requests as early as 2015.

251. Plaintiff's disabilities led to Defendants' unlawful conduct toward Plaintiff.

252. Defendant's unlawful conduct created a climate of fear and intimidation for Plaintiff and/or negatively impacted the terms, privileges, and/or conditions of her employment.

253. The reasons proffered by Defendant for its unlawful conduct are pretextual and the Defendant cannot further offer any legitimate reason for its unlawful conduct.

254. Defendants' harassing conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of her disabilities and reasonable accommodation request.

255. Defendant, implicitly or explicitly, with intent and knowledge of the foreseeable consequences, condoned, authorized, or ratified the conduct of their agents, promoted or permitted a working environment where such conduct was tolerated, condoned or encouraged, and systematically violated Federal law prohibiting disability harassment in the workplace under the theory of *respondeat superior*.

256. As a result of Defendant's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including, but not limited to, lost earnings and other financial losses, embarrassment, humiliation and other forms of pain and suffering that is on-going, and are permanent in nature without Plaintiff in anyway contributing to the negligence thereto.

**<u>COUNT FOUR</u>**

**Reprisal Harassment**

29 U.S.C. § 791, *et seq.*; 42 U.S.C. § 12203, *et seq.*; 42 U.S.C. § 2000e-3, *et seq.*

(*Hostile Work Environment*)

257. Plaintiff incorporates all information and allegations contained in the preceding paragraphs, as if fully set forth herein.

258. The Rehabilitation Act, by incorporating by reference to the Americans with Disabilities Act's reprisal prohibition, prohibits reprisal for requesting an accommodation based on one's disability and/or filing a complaint of disability discrimination.

259. Title VII prohibits reprisal for engaging in prior EEO activities.

260. As a governmental entity that receives federal financial assistance and/or employs federal employees, Defendant must comply with the Rehabilitation Act and Title VII.

261. Plaintiff's protected EEO activities for reprisal include EEO complaints she initiated back in 2013, and 2015, based on her disability prior to the instant complaint at issue, the current complaint at issue, and her requests for reasonable accommodation.

262. Plaintiff was subjected to retaliation from the Defendant through itself and/or its agents based on Plaintiff's protected status, for its direct conduct against Plaintiff and/or through *respondeat superior*.

263. Defendant's agents retaliated against Plaintiff as a result of her oppositional and/or protected activity by, *inter alia*, adding sixteen (16) or so cases to her queue while she was on leave, requiring her to expedite cases with no warning, removing her civilian fitness program privileges, requiring her to change to a more restrictive daily schedule to prevent her from attending medical appointments, requiring her to check in and check out every day, failing to accommodate her disabilities, giving her negative performance feedback on her performance

appraisals, failing to approve her leave requests in a timely manner, scheduling meeting(s) for days she was on leave, sharing intimate details about her disabilities with at least one employee who did not have a need to know, presenting inaccurate statistics on her case adjudication numbers, requiring her to perform additional duties beyond what was required, and prioritizing certain cases that hurt her case adjudication merits.

264. Defendants harassed Plaintiff as a result of her oppositional and/or protected activity.

265. Defendant's unlawful conduct created a climate of fear and intimidation for Plaintiff and/or negatively impacted the terms, privileges, and/or conditions of her employment.

266. The reasons proffered by Defendant for its unlawful conduct are pretextual and the Defendant cannot further offer any legitimate reason for its unlawful conduct.

267. Defendants' harassing conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of her EEO protected activities.

268. Defendant, implicitly or explicitly, with intent and knowledge of the foreseeable consequences, condoned, authorized, or ratified the conduct of their agents, promoted or permitted a working environment where such conduct was tolerated, condoned or encouraged, and systematically violated Federal law prohibiting disability harassment in the workplace under the theory of *respondeat superior*.

269. As a result of Defendant's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including, but not limited to, lost earnings and other financial losses, embarrassment, humiliation and other forms of pain and suffering that is on-going, and are permanent in nature without Plaintiff in anyway contributing to the negligence

thereto.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Makebah Childress, respectfully prays that this Court grant her the following relief:

a.) Award compensatory damages of in excess of Two-Hundred and Fifty Thousand Dollars ($250,000.00), which would fully compensate Plaintiff for the economic loss, physical and psychological injury, humiliation, embarrassment, and mental and emotional distress caused by the conduct of Defendant alleged herein;

b.) Award any relevant back pay owed as a result of Defendant's illegal actions;

d.) Award reasonable attorney's fees;

e.) Award equitable, declaratory, and injunctive relief; and

f.) Order such other and further relief as this Honorable Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues in this case so triable.

Dated: September 18, 2026

Respectfully Submitted,

TULLY RINCKEY PLLC

/s *Stephanie Rapp-Tully*______
Stephanie Rapp-Tully
Bar No. 1016900
Partner

/s__*Michael R. Goldstein*___
Michael R. Goldstein
Bar No. 1602033
Senior Associate

2001 L Street NW, Suite 902
Washington, DC 20036
Tel: (202) 787-1900
Fax: (202) 640-2059
Email: Srapptully@fedattorney.com
Mgoldstein@fedattorney.com

*Attorneys for Plaintiff*